**No. 25-4978**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

BRITTANY BOUNTHON, VIVIANNA RIVERA, AND GINA ALLEN,
individually, and on behalf of others similarly situated,

*Plaintiffs- Appellants*,

v.

THE PROCTOR & GAMBLE COMPANY,

*Defendant-Appellee*.

On Appeal from the U.S. District Court for the Northern District of California
No. 3:23-cv-00765-AMO · The Honorable Araceli Martinez-Olguín

### PLAINTIFFS-APPELLANTS' OPENING BRIEF

Rachel Soffin (FL Bar No. 18054)
Mailing Address:
PEARSON WARSHAW, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
(818) 788-8300
*rsoffin@pwfirm.com*

Melissa S. Weiner
PEARSON WARSHAW, LLP
328 Barry Ave. S., Suite 200
Wayzata, MN 55391
(612) 389-0600
*mweiner@pwfirm.com*

Hannah M. Kieschnick
Leila Nasrolahi
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
*hkieschnick@publicjustice.net*
*lnasrolahi@publicjustice.net*

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
*lnicholls@publicjustice.net*

*Additional counsel for Plaintiffs-Appellants listed on signature page*

## TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................ iii

Introduction .......................................................................................1

Statement of the Issues Presented for Review ......................................4

Statement of Jurisdiction....................................................................4

Statement of the Case........................................................................5

    A.    Tampax Pure Cotton is P&G's response to consumer demand for feminine hygiene products that limit their exposure to unnecessary chemicals or contaminants ....................................................................5

    B.    Despite P&G's promises, Tampax Pure Cotton tampons are not "pure" and "100% organic" because they contain organic fluorine, a man-made chemical ..................................................................9

    C.    The plaintiffs challenged P&G's misrepresentations about Tampax Pure Cotton tampons, but the district court dismissed the second amended complaint because it found the link between organic fluorine and forever chemicals to be implausible ...................................10

    D.    The plaintiffs addressed the district court's concerns, but the district court dismissed the third amended complaint ...........................................15

Standard of Review.........................................................................17

Summary of the Argument................................................................18

Argument .......................................................................................21

    I.    The plaintiffs have plausibly alleged that a reasonable consumer would understand Tampax Pure Cotton tampons to be free from chemicals or contaminants or, at the least, undisclosed chemicals or contaminants ...............................................................22

i

A. The Tampax Pure Cotton brand name, emphasis on "100% organic cotton," and cotton plant imagery all reasonably convey that the tampons are chemical-free......................................................23

B. P&G's arguments about what reasonable consumers might understand are not properly addressed at the pleading stage...............27

II. The plaintiffs have plausibly alleged that the detected organic fluorine is a man-made chemical compound whose presence contradicts P&G's representations about the contents of Tampax Pure Cotton tampons ...............................................................................33

A. The district court should not have required the plaintiffs to prove, at the pleading stage, that the organic fluorine detected in Tampax Pure Cotton tampons is man-made rather than natural.......................34

B. The district court should not have required the plaintiffs to allege that the level of organic fluorine detected in Tampax Pure Cotton tampons is harmful ............................................................................41

Conclusion ..................................................................................................43

Certificate of Compliance ..........................................................................

Certificate of Service ..................................................................................

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axon v. Florida's Natural Growers, Inc.*,
    813 F. App'x 701 (2d Cir. 2020)................................................................25

*Balser v. Hain Celestial Group, Inc.*,
    640 F. App'x 694 (9th Cir. 2016)..............................................................26

*Becerra v. Dr Pepper/Seven Up, Inc.*,
    945 F.3d 1225 (9th Cir. 2019)..................................................................23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................36

*Bell v. Publix Super Markets, Inc.*,
    982 F.3d 468 (7th Cir. 2020) ...................................................................26

*Benavidez v. County of San Diego*,
    993 F.3d 1134 (9th Cir. 2021) ..................................................................35

*Berke v. Whole Foods Market Inc.*,
    No. 2:19-CV-07471, 2020 WL 5802370
    (C.D. Cal. Sept. 18, 2020) ....................................................... 24, 25, 41, 42

*Bobo v. Optimum Nutrition, Inc.*,
    No. 3:13-CV-02408, 2015 WL 13102417 (S.D. Cal. Sept. 11, 2025)..........31

*Brady v. Bayer Corp.*,
    26 Cal. App. 5th 1167 (2018) ................................................................. 29, 30

*Brown v. Hain Celestial Group, Inc.*,
    913 F. Supp. 2d 881 (N.D. Cal. 2012).......................................................25

*Castillo v. Prime Hydration LLC*,
    748 F. Supp. 3d 757 (N.D. Cal. 2024).......................................................27

*Gasser v. Kiss My Face*,
    No. 3:17-CV-01675, 2018 WL 4538729
    (N.D. Cal. Sept. 21, 2018) ....................................................... 37, 38, 40

*In re Theos Dark Chocolate Litig.*,
    750 F. Supp. 3d 1069 (N.D. Cal. 2024).....................................................25

*Jou v. Kimberly-Clark Corp.*,
    No. 3:13-CV-03075, 2013 WL 6491158 (N.D. Cal. Dec. 10, 2013)............26

*Kasky v. Nike, Inc.*,
    27 Cal.4th 939 (2002) ...................................................................21

*Krommenhock v. Post Foods, LLC*,
    255 F. Supp. 3d 938 (N.D. Cal. 2017).........................................40

*Kwikset Corp. v. Superior Court*,
    51 Cal.4th 310 (2011) ...................................................................42

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) .......................................................39

*Lowe v. Edgewell Personal Care Co.*,
    711 F. Supp. 3d 1097 (N.D. Cal. 2024).......................................11

*McGinity v. Procter & Gamble Co.*,
    69 F.4th 1093 (9th Cir. 2023) .......................................................30

*Rojas v. General Mills, Inc.*,
    No. 3:12-CV-05099, 2014 WL 1248017 (N.D. Cal. Mar. 26, 2014).... 27, 28

*Sonner v. Schwabe North America, Inc.*,
    911 F.3d 989 (9th Cir. 2018) .......................................................39

*Squeo v. Campbell Soup Co.*,
    No. 5:24-CV-02235, 2024 WL 4557680
    (N.D. Cal. Oct. 22, 2024) ......................................... 36, 37, 38, 39

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ................................. 35, 36, 39, 40

*Stoner v. Santa Clara County Office of Education*,
    502 F.3d 1116 (9th Cir. 2007) ......................................................17

*Taylor v. Procter & Gamble Co.*,
    No. 3:22-CV-01949, 2023 WL 5289451 (S.D. Ill. Aug. 17, 2023) ..............28

*Tran v. Sioux Honey Association, Coop.*,
    No. 8:17-CV-110, 2018 WL 10612686 (C.D. Cal. Aug. 20, 2018)..............24

*Warren v. Whole Foods Market California, Inc.*,
    No. 3:21-CV-04577, 2022 WL 2644103 (N.D. Cal. July 8, 2022)........ 36, 38

*Whiteside v. Kimberly Clark Corp.*,
    108 F.4th 771 (9th Cir. 2024) ............................................. *passim*

*Williams v. Gerber Products Co.*,
    552 F.3d 934 (9th Cir. 2008) ..................................... 21, 22, 27

iv

*Winans v. Ornua Foods North America, Inc.*,
    731 F. Supp. 3d 422 (E.D.N.Y. 2024) ...................................................................25

*Zapata Fonseca v. Goya Foods Inc.*,
    No. 5:16-CV-02559, 2016 WL 4698942 (N.D. Cal. Sept. 8, 2016) .............36

**Statutes**

28 U.S.C. § 1291 ...........................................................................................................4

28 U.S.C. § 1332 ...........................................................................................................4

28 U.S.C. § 1367 ...........................................................................................................4

Cal. Bus. & Prof. Code § 17200 ................................................................................11

Cal. Bus. & Prof. Code § 17200 ................................................................................11

Cal. Civ. Code § 1750 ................................................................................................11

**Other**

*100 percent*, Merriam-Webster,
    https://perma.cc/H62Z-N6F6 (last visited Nov. 24, 2025) ..........................24

Federal Rule of Civil Procedure 12(b)(6) ........................................................ 4, 17

*Organic*, Merriam-Webster,
    https://perma.cc/2B54-59Z7 (last visited Nov. 24, 2025) ............................24

*Pure*, Merriam-Webster,
    https://perma.cc/ZEB4-ZEP6 (last visited Nov. 24, 2025) ..........................24

**INTRODUCTION**

An increasing number of women understandably want to use organic feminine hygiene products that limit their exposure to unnecessary or potentially dangerous chemicals. To capitalize on that demand, The Proctor & Gamble Company (P&G) markets its Tampax "Pure Cotton" tampons with prominent labeling designed to reinforce the false notion that the tampons are free from artificial chemicals or contaminants. Building on the clear message in the "Pure Cotton" brand name, the front label of the product touts the tampons' "100% organic cotton core," underscored by multiple images of the cotton plant. If a consumer were to look at the back label, it drives the message home, again trumpeting the tampons as "Pure Cotton" and containing "100% organic cotton" components. Notwithstanding this messaging, Tampax Pure Cotton tampons contain "organic fluorine"—a chemical compound that, despite its name, is almost exclusively man-made and commonly found in products like pesticides and per- and polyfluoroalkyl substances (PFAS), a class of industrial chemicals often referred to as forever chemicals.

Plaintiffs Brittany Bounthon, Vivianna Rivera, and Gina Allen regularly bought Tampax Pure Cotton tampons because they wanted an alternative for managing their menstrual flow that limited their exposure to chemicals or contaminants, as traditional tampons can be chock full of potentially concerning ingredients. Rather than take the risk of exposure, the plaintiffs and other consumers

1

relied on P&G's false and misleading representations and paid more for tampons they reasonably thought were "pure" and "organic." In other words, the theory of their case is simple: Reasonable consumers believe that products labeled "pure" and "100% organic cotton" are chemical- or contaminant-free; P&G misrepresents Tampax Pure Cotton tampons with "100% organic cotton" because they contain an undisclosed man-made chemical compound; and P&G is able to charge more for these tampons because consumers reasonably believe they are a premium alternative to traditional products that limits their exposure to chemicals or contaminants.

P&G, of course, has disputed much of this, chiefly arguing in the district court that reasonable consumers would not actually take the company at its word that the tampons are "pure" and "100% organic cotton." It further asserted that those representations are literally true because organic fluorine can, in the rarest of circumstances, come from natural sources and so cannot be considered an artificial chemical or contaminant. P&G offered other arguments too, including that the plaintiffs have not plausibly alleged that the level of organic fluorine in Tampax Pure Cotton tampons is harmful.

The district court granted P&G's motion to dismiss. In doing so, it erred twice over, improperly holding the plaintiffs to an unduly stringent pleading standard and misconstruing the nature of the plaintiffs' theory of misrepresentation. As to the first error, the plaintiffs alleged, based on scientific literature and independent third-party

2

testing from a certified laboratory, that the organic fluorine detected in Tampax Pure Cotton tampons is artificial and, therefore, an undisclosed chemical or contaminant. At this early stage in the litigation, the district court should have taken these allegations as true and asked whether the plaintiffs' claims are plausible—which they are. Instead, the district court improperly inverted that standard by faulting the plaintiffs for not proving their interpretation of the science and not disproving P&G's arguments to the contrary. That was not the plaintiffs' burden, and the district court should have left whether the evidence ultimately supports the plaintiffs' allegations for summary judgment.

As to the second error, the plaintiffs' false and misleading claims turn on P&G's affirmative misrepresentations about what Tampax Pure Cotton tampons contain rather than whether the tampons are safe. The fact that consumers may care about the presence of chemicals or contaminants because they want to avoid unnecessary exposure to potentially harmful chemicals does not mean the plaintiffs also had to plausibly allege there is in fact a risk of exposure to harm. The district court should not, therefore, have faulted the plaintiffs for omitting allegations simply irrelevant to their theory of misrepresentation.

The plaintiffs more than cleared the low bar of plausibility at this stage and should be permitted to test, and ultimately prove, their well-founded allegations in the course of litigation. This Court should reverse.

3

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The issues presented are:

(1)     Whether the district court erred by concluding the plaintiffs failed to plausibly allege that Tampax Pure Cotton tampons contain an undisclosed man-made chemical or contaminant, even though they alleged, based on independent third-party testing and scientific literature, that the tampons contain organic fluorine, a chemical compound that is almost exclusively man-made.

(2)     Whether the district court erred by faulting the plaintiffs for not alleging that the level of organic fluorine in Tampax Pure Cotton tampons is harmful to human health, when that fact would have no bearing on the plaintiffs' claims.

## STATEMENT OF JURISDICTION

The plaintiffs invoked the district court's jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332. ER-12 ¶ 17. The district court also had supplemental jurisdiction over the plaintiffs' state law claims under 28 U.S.C. § 1367. ER-12 ¶ 17.

On July 7, 2025, the district court granted P&G's motion to dismiss the plaintiffs' Third Amended Complaint, without leave to amend, pursuant to Federal Rule of Civil Procedure 12(b)(6). ER-4-6 (order); ER-7 (judgment). On August 6, 2025, the plaintiffs timely filed a notice of appeal. ER-121. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

4

## STATEMENT OF THE CASE

### A. Tampax Pure Cotton is P&G's response to consumer demand for feminine hygiene products that limit their exposure to unnecessary chemicals or contaminants.

P&G has built its brand on the promise that, for nearly a century, it has produced household and personal care products that consumers can trust. ER-14 ¶ 30; ER-21 ¶ 52; ER-25 ¶ 76. As the owner of the leading brands in those marketplaces, P&G is necessarily aware of consumer demand. And consumers are increasingly spending more on natural and organic consumer products that limit their exposure to chemicals. They value such products for numerous reasons, including for their potential health and wellness benefits and to help the environment.

The market for feminine hygiene products is no different. There are a growing number of women who seek methods of managing their menstruation in a way that limit their exposure to unnecessary and potentially harmful chemicals or contaminants. ER-9 ¶ 3; ER-15 ¶ 33. This desire makes sense. Women use tampons by inserting them into their vaginas, ER-14 ¶ 26, which absorb chemicals at a higher rate than other areas of the body. ER-9 ¶ 3. And because women spend, on average, more than 9 years of their lives menstruating, the opportunity for exposure is substantial. ER-13-14 ¶ 25; *see also* ER-9 ¶ 2 (34.1 million women in the U.S. used tampons to manage their menstruation in 2020). Understandably, many women would prefer to avoid any risk of exposure.

5

P&G and its Tampax brand have long been leaders in the menstrual products market. ER-14 ¶¶ 28-31; ER-15 ¶ 34. Seeking to capitalize on an "unmet need in the natural menstrual category," ER-15 ¶ 34, P&G launched a new product in 2019: the Tampax Pure Cotton tampon. ER-15 ¶ 35; *see also* ER-24 ¶ 75 (alleging that P&G knows "consumers are increasingly demanding menstrual products that are free from undisclosed ingredients and that otherwise support their wellness goals"); ER-26 ¶ 89 (alleging that P&G knows "consumers are concerned about the use of" various "synthetic chemicals and contaminants in its Products").

P&G intentionally and knowingly leads consumers to believe Tampax Pure Cotton tampons do not contain chemicals or contaminants. ER-10 ¶ 5; ER-25 ¶ 78. It starts with the brand name, Tampax "Pure Cotton*," which appears prominently on the front label of the product. ER-10 ¶ 5; ER-16-17 ¶ 39. The asterisk after the brand name directs consumers to the statement right below, "*contains **100% organic** cotton core," which emphasizes in bold that "pure cotton" means "100% organic cotton." ER-10 ¶ 5; ER-16-17 ¶ 39. (emphasis in original). The front label is also adorned with illustrations of cotton plants to convey these tampons are made of just that. ER-10 ¶ 5; ER-16-17 ¶ 39. Consistent with this messaging, the front

label emphasizes that Tampax Pure Cotton tampons are "free of dyes, fragrances & chlorine bleaching." ER-10 ¶ 5; ER-16-17 ¶ 39.



If a consumer were to look at the back label, they would see that it likewise repeats the "Pure Cotton" brand name and boldly declares, "The Best of Science and Nature." ER-10-11 ¶ 6; ER-17-18 ¶ 40. Next to an illustration of a plain white tampon and surrounded by more images of cotton plants, the label emphasizes again that the product "**contains 100% organic cotton core**" and also that it "**contains 100% organic cotton outerwrap**." ER-10-11 ¶ 6; ER-17-18 ¶ 40. (emphasis in original). That is in contrast to the "**60% plant-based plastic applicator**," which is also illustrated and is what women use to insert tampons. ER-10-11 ¶ 6; ER-17-18 ¶ 40 (emphasis in original).

7

In addition to this labeling, P&G has aggressively and uniformly marketed Tampax Pure Cotton tampons as a chemical-free choice for feminine hygiene products. In one press release, P&G emphasized the "simple ingredients" in the tampons and asserted that "PURE offers people the ingredients they want with the trusted protection they expect from Tampax." ER-15-16 ¶ 36. Similarly, its website touts Tampax Pure Cotton tampons as containing "only the ingredients you need" and confirms that "[s]electing ingredients and materials is the most important choice we make." ER-19 ¶¶ 43-44. P&G makes clear what those ingredients are when it comes to "Tampax PURE tampons": "just cotton." ER-21 ¶ 49. To drive the point home, P&G claims to purify its cotton to *remove* contaminants. ER-20 ¶¶ 45-46.

In all, P&G's uniform labeling and marketing campaign is designed to convince consumers that Tampax Pure Cotton tampons are a "pure," "100% organic cotton," and chemical-free alternative to traditional feminine hygiene products. ER-24 ¶¶ 70-71. That campaign has worked: A reasonable consumer would believe tampons made with "pure" and "100% organic cotton" do not also contain man-made chemicals or contaminants or, at the very least, man-made chemicals or contaminants that have not been disclosed. ER-27 ¶ 91; *see also* ER-16 ¶ 38. Indeed, that's exactly what the plaintiffs believed, and sought, when they repeatedly purchased Tampax Pure Cotton tampons. ER-27 ¶ 92; ER-28 ¶¶ 98, 100; ER-29 ¶¶ 105, 107; ER-30 ¶¶ 112, 114.

8

P&G has been able to capitalize on consumer demand for cleaner and more natural products, charging a premium for Tampax Pure Cotton tampons over other tampon brands not marketed as "pure" or "organic." ER-27 ¶ 93. In fact, P&G is able to sell Tampax Pure Cotton tampons for as much as $0.19 more *per tampon* over its other Tampax products. ER-27 ¶ 94.

**B. Despite P&G's promises, Tampax Pure Cotton tampons are not "pure" and "100% organic" because they contain organic fluorine, a man-made chemical.**

Although Tampax Pure Cotton tampons are labeled and advertised as "pure" and "100% organic cotton," the plaintiffs allege they actually contain "organic fluorine"—a chemical compound that, despite its name, is "almost exclusively man-made and used in industrial applications." ER-22 ¶ 57. Organic fluorine is commonly found in pharmaceuticals, agrochemicals, and all varieties of PFAS or forever chemicals. *Id.* Relying on scientific literature about organic fluorine, the plaintiffs allege it is "exceedingly rare" for the chemical compound to be naturally occurring or to be found in natural sources. ER-22 ¶ 58. As the plaintiffs allege, again relying on scientific literature, natural organic fluorine—like that found in the deadly poison from a rare South African plant—is simply "not found or used in the industrial world" with a mass-produced product, and therefore is "never" the organic fluorine in a consumer product, even incidentally. *Id.*

9

Working with a certified laboratory to conduct independent third-party testing, the plaintiffs used Total Organic Fluorine (TOF) analysis to test Tampax Pure Cotton tampons for organic fluorine. ER-23 ¶ 60. They conducted this testing on three different samples over a period of one year, starting with the whole tampon before analyzing each individual component of the tampon. ER-23 ¶ 63. This testing uniformly showed that both the finished whole tampon and each component, including the absorbent core and fabric overwrap represented as "100% organic cotton," contained organic fluorine. ER-23 ¶¶ 64-65.

**C. The plaintiffs challenged P&G's misrepresentations about Tampax Pure Cotton tampons, but the district court dismissed their second amended complaint because it found the link between organic fluorine and forever chemicals to be implausible.**

Ms. Bounthon, Ms. Rivera, and Ms. Allen, three California residents, repeatedly purchased Tampax Pure Cotton tampons because they wanted to use "chemical and contaminant-free feminine hygiene products." ER-28 ¶¶ 97-98; ER-29 ¶¶ 104-05; ER-30 ¶¶ 111-12. They purchased those tampons after reviewing and in reliance on P&G's representations of the products as "pure" and "100% organic cotton," ER-28 ¶¶ 99, 101; ER-29 ¶¶ 106, 108; ER-30-31 ¶¶ 113, 115, reasonably believing Tampax Pure Cotton tampons to be "pure," "organic," and therefore "free from synthetical chemicals, pesticides, and other non-organic ingredients [or] contaminants" or, at the least, "undisclosed chemicals [or] contaminants." ER-28 ¶ 100; ER-29 ¶ 107; ER-30 ¶ 114. They would not have purchased those tampons or

10

would have paid less for them if they had known Tampax Pure Cotton tampons actually contain an undisclosed man-made chemical, organic fluorine. ER-26 ¶ 85; ER-27 ¶ 95; ER-28 ¶ 101; ER-29 ¶ 108; ER-31 ¶ 115; ER-35 ¶ 141.

In February 2023, the plaintiffs filed a class action complaint against P&G in the Northern District of California. Compl., ECF 1 (Feb. 21, 2023). In the operative third amended complaint,[1] the plaintiffs assert five causes of action: violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*, violation of consumer protection statutes under the laws of 10 states,[2] and unjust enrichment/quasi-contract. ER-38-48. They seek to represent three putative

---

[1] By stipulation of the parties, ECF 27 (Apr. 20, 2023), the plaintiffs filed a first amended complaint in May 2023. Am. Compl., ECF 39 (May 26, 2023). P&G then moved to dismiss that complaint, Mot. to Dismiss Am. Compl., ECF 42 (June 23, 2023), which the district court did in January 2024, *see* Text Order, ECF 59 (Jan. 12, 2024) (granting motion to dismiss for the reasons provided in *Lowe v. Edgewell Personal Care Co.*, 711 F. Supp. 3d 1097 (N.D. Cal. 2024), a similar case raising similar allegations). The plaintiffs filed the second amended complaint in February 2024, Second Am. Compl., ECF 67 (Feb. 21, 2024); ER-67-120, which P&G again moved to dismiss, Mot. to Dismiss Second Am. Compl., ECF 71 (Apr. 11, 2024). As explained more fully below, after a hearing, the district court granted that motion with leave to amend, Order, ECF 79 (Oct. 15, 2024) (ER-50-67), and the plaintiffs filed the operative complaint in November 2024, Third Am. Compl., ECF 80 (Nov. 5, 2024) (ER-8-49).

[2] Those states are California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington. ER-35 ¶ 143.

classes: people who purchased Tampon Pure Cotton tampons for personal use and within the applicable statute of limitations "in the United States" (the Nationwide Class), in 10 states (the Multi-State Consumer Protection Class), and in California (the California Class). *See* ER-35 ¶¶ 142-44.

In the second amended complaint, the plaintiffs' theory underlying each cause of action was that P&G misrepresented Tampax Pure Cotton tampons as "not contain[ing] any chemicals that are potentially harmful" and as being "a healthy product for absorbing menstrual fluid" when the tampons actually contain PFAS. ER-69 ¶ 5; ER-70 ¶ 10. To support this theory, the plaintiffs alleged that PFAS are a class of man-made forever chemicals that can be absorbed into the bloodstream through the skin and that have been associated with various negative health effects, including decreased fertility and increased risk of cancers. ER-83 ¶ 58; ER-84-87 ¶¶ 63-77. The plaintiffs alleged that testing for PFAS directly is underinclusive because targeted analysis is only able to identify approximately 0.06% of the 12,000 different PFAS structures. ER-88-89 ¶¶ 82-86. Instead, the well-accepted standard for confirming the presence of PFAS is TOF analysis because organic fluorine is present in every PFAS. ER-89 ¶¶ 87, 91-92; ER-90 ¶ 100. As explained above, the plaintiffs commissioned independent third-party TOF testing by a certified laboratory, which detected organic fluorine in both the tampon as a whole and each

12

of its individual components. *See* ER-91-92 ¶¶ 106-09. The plaintiffs therefore alleged that Tampax Pure Cotton tampons contain PFAS. ER-92 ¶ 107.

P&G moved to dismiss. Its main focus was the plaintiffs' purportedly implausible theory that Tampax Pure Cotton tampons contain PFAS because while every PFAS contains organic fluorine, organic fluorine is also linked to other industrial products, like pharmaceuticals, and even some natural sources. *See* Mot. to Dismiss Second Am. Compl. at 5, 9-11. Thus, the presence of organic fluorine does not "necessarily" mean the product contains PFAS, *id.* at 5, "let alone a potentially harmful" type of PFAS. *Id.* at 9. The plaintiffs countered with examples of courts accepting TOF analysis as sufficient to plausibly establish the presence of PFAS at the pleading stage and pointed to their well-founded allegations that *all* PFAS can be harmful at even low levels of exposure. Opp. to Mot. to Dismiss Second Am. Compl. at 8, ECF 73 (Apr. 25, 2024).

P&G also argued the plaintiffs lacked standing because they had failed to allege that, by using Tampax Pure Cotton tampons, they were exposed to harmful levels of PFAS. Mot. to Dismiss Second Am. Compl. at 13-16. But as the plaintiffs emphasized in response, because they had alleged "affirmative misrepresentations," their claims were not "based solely on a risk of future harm" but on the economic harm of overpaying for a product represented as being "pure" and "100% organic cotton" when it was not those things. Opp. to Mot. to Dismiss Second Am. Compl.

13

at 10. In other words, they paid a "price premium based on defendant's alleged misrepresentations." *Id.* at 11.

After a hearing, the district court issued an order granting in part and denying in part P&G's motion. *See* ER-50-66. The district court first concluded that the plaintiffs had standing because each had alleged that "she relied on P&G's representations" about Tampax Pure Cotton tampons and "would not have purchased" those tampons, or would not have paid a price premium for those products, "if the true facts had been known." ER-62.

The district court found the plaintiffs' allegations insufficient, however, when it came to the presence of PFAS. ER-63. While the court had no issue with the plaintiffs' allegations about the third-party testing itself, it identified two issues with the plaintiffs' allegations interpreting the results of the testing. First, the district court concluded that it could not infer that the detected organic fluorine meant the tampons contain PFAS because the scientific literature cited by the plaintiffs acknowledged that organic fluorine can also be present in other chemicals "that are not PFAS," and that some organic fluorine is naturally occurring. ER-63. Second, the district court concluded that, even if the plaintiffs had plausibly alleged "that organic fluorine shows the presence of PFAS" in Tampax Pure Cotton tampons, they had not alleged that the levels detected—"30 parts per million, with higher concentrations in the aggregate"—are harmful because some sources cited in the complaint described

14

products as being "healthier" at even higher levels. ER-64. The court granted the motion to dismiss without reaching P&G's alternative grounds for dismissal. ER-65-66.

**D. The plaintiffs addressed the district court's concerns, but the district court dismissed the third amended complaint.**

In response to the district court's order, the plaintiffs filed a third amended complaint that narrowed their theory of liability in two ways. First, while the previous complaint focused on PFAS chemicals, the third amended complaint simplified the allegations to make plain that what matters is that the plaintiffs' testing confirms the tampons contain organic fluorine, a chemical compound that, when found in mass-produced consumer products, is almost exclusively if not exclusively man-made. ER-22-23 ¶¶ 57-59. As a result, whether the organic fluorine is indicative "of PFAS chemicals, or other organic fluorinated compounds such as pesticides, is ultimately inconsequential" because, "[r]egardless of its source, the presence of organic fluorine contradicts all of Defendant's uniform marketing" that the tampons are "pure" and "100% organic cotton." ER-23 ¶ 69.

Second, while the previous complaints alleged that P&G misrepresented the contents of Tampax Pure Tampons *and* misrepresented those tampons as being healthy, the third amended complaint simplified the allegations to focus solely on the misrepresentations about the contents of the tampons as "pure" and "100% organic." *See* ER-11 ¶¶ 8-9; *see also* Opp. to Mot. to Dismiss Third Am. Compl. at

15

5 (emphasizing that plaintiffs' claims "hinge" on whether Tampax Pure Cotton tampons "contain ingredients that contradict the[] unambiguous label promises—not whether the ingredients themselves are dangerous or potentially harmful").

Despite the plaintiffs' narrowed theory, P&G sought to dismiss the third amended complaint on largely the same grounds as the previous complaint: as relevant here, that it was implausible that the organic fluorine in its tampons is a man-made chemical or contaminant, Mot. to Dismiss Third Am. Compl. at 8-10, or that it is harmful. *Id.* at 10-13.

Seemingly also overlooking the differences between the second and third amended complaints, the district court held that the plaintiffs' allegations "fail[] for the same reason that resulted in the dismissal of [the prior] pleadings." ER-4. In particular, although the court again did not—as it could not on a motion to dismiss—question the results of the plaintiffs' third-party testing, it found "any allegations *based on* that testing [] implausible" for two reasons. ER-5 (emphasis added). First, it saw no allegations about whether the detected organic fluorine "may be indicative of natural sources" or "some unspecified man-made chemical or contaminant," ER-5 (citation modified)—despite the plaintiffs' well-founded allegations, based on scientific literature, that the organic fluorine in consumer products is almost certainly man-made. ER-22 ¶¶ 57-58; ER-23 ¶¶ 68-69. Second, the court found "insufficient" the plaintiffs' allegation that the third-party testing detected "above trace amounts"

16

of organic fluorine, ER-6, apparently because the plaintiffs had not alleged harmful levels of organic fluorine, *see id.* (referencing order dismissing second amended complaint); ER-64 (order dismissing second amended complaint on these grounds)—ignoring that the plaintiffs had expressly limited their theory of liability and clarified they were *not* advancing any purported health claims. *See* Opp. to Mot. to Dismiss Third Am. Compl. at 2-3, 5. The district court did not reach P&G's other bases for dismissal before dismissing the third amended complaint, this time without leave to amend. ER-6.

The plaintiffs timely filed their notice of appeal. ER-121.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777 (9th Cir. 2024). In doing so, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." *Id.* (quoting *Stoner v. Santa Clara Cnty. Off. of Educ.*, 502 F.3d 1116, 1120 (9th Cir. 2007)). "Dismissal of the complaint is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Stoner*, 502 F.3d at 1120 (citation omitted).

17

## SUMMARY OF ARGUMENT

The district court erred in dismissing the plaintiffs' third amended complaint with prejudice by misapplying the motion to dismiss standard and misunderstanding the plaintiffs' theory of liability.

The third amended complaint turns solely on a theory of misrepresentation about the contents of Tampax Pure Cotton tampons and not also whether the tampons are safe. Here, the plaintiffs have alleged that the packaging for Tampax Pure Cotton tampons would deceive reasonable consumers into believing the tampons are pure, organic, and therefore free from chemicals or contaminants when, the plaintiffs allege, they actually contain an artificial chemical compound—organic fluorine. That straightforward understanding flows from P&G's emphasis on purity in the brand name and its confirmation on the front label that "Pure Cotton" tampons "contain[] 100% organic cotton core," read in context with the prominent images of the cotton plant. Both ordinary dictionary definitions and scores of case law confirm that a reasonable consumer would interpret phrases like "pure" and "100% organic" to convey an absence of chemicals or contaminants.

P&G may dispute this understanding based largely on a purported clarifying disclaimer on the front label of Tampax Pure Cotton boxes and the ingredient list on the side panel. But the disclaimer directly links "pure cotton" and "100% organic cotton" and so underscores why the representations are deceptive. As to the side

18

panel, it should not be considered at this stage of the litigation: Because the front label is "unambiguously deceptive," P&G "cannot take away in the back fine print what [it] gave on the front in large conspicuous print." *Whiteside*, 108 F.4th at 780 (citation omitted). But even if the ingredient list were considered, it also reinforces the deception because a reasonable consumer could interpret the tampons themselves to be chemical-free and the plastic applicator and packaging to be the sources of the listed artificial ingredients. At a minimum, though, a reasonable consumer would understand Tampax Pure Cotton tampons to not contain *undisclosed* chemicals or contaminants and the ingredient list does *not* disclose organic fluorine. Regardless of how much of this additional information is considered, whether reasonable consumers would be deceived is a quintessential question of fact generally not to be resolved on a motion to dismiss.

Below, the district court focused on whether the plaintiffs have alleged an affirmative misrepresentation based on the presence of organic fluorine in the tampons. The court seemingly took as true, as it must, that the plaintiffs' independent third-party testing detected organic fluorine in both the whole of the Tampax Pure Cotton tampon and each individual component. But it faulted the plaintiffs' allegations interpreting those testing results. Relying on scientific literature, the plaintiffs alleged that the detected organic fluorine is an artificial chemical or contaminant because organic fluorine is almost exclusively if not exclusively man-

19

made. While P&G hypothesized that the detected organic fluorine could have come from natural sources, the plaintiffs alleged that such a possibility was remote at best because naturally occurring organic fluorine is exceedingly rare and not found in mass-produced consumer products like tampons. Instead of taking the plaintiffs' allegations as true, the district court faulted the plaintiffs for not *disproving* P&G's hypothetical about the source of organic fluorine. That was error. A plaintiff's claims need only be plausible and, at this early stage in the litigation, the court could have reasonably inferred from the allegations that the organic fluorine in the tampons is an artificial chemical or contaminant.

The court went on to conclude that even if the plaintiffs had alleged organic fluorine was a chemical or contaminant, they had not alleged it was a harmful one at "above-trace" levels. The district court was right in part: The plaintiffs did not include in the third amended complaint any allegations about whether the level of organic fluorine in Tampax Pure Cotton tampons is harmful—because that is not relevant to the plaintiffs' theory of liability. Rather, their allegations focus solely on P&G's representations about the presence of chemicals or contaminants in the tampons, and the district court should not have faulted the plaintiffs for not supporting a theory not at issue in the operative complaint.

This Court should reverse.

20

## ARGUMENT

As relevant here, the plaintiffs have brought claims under the UCL, FAL, and CLRA, which prohibit "not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951 (2002)) (citation modified). Whether a representation is false or misleading under these statutes is governed by the "reasonable consumer" standard, under which a plaintiff "must show that members of the public are likely to be deceived." *Id.* (citation modified). In practical terms, for a representation to be actionable, a plaintiff must show that reality is not what it seems—that is, that there is a delta between what a reasonable consumer would believe the product to be and what the product actually is.[3]

---

[3] The plaintiffs' other claims—violations of other state consumer protection statutes and unjust enrichment/quasi contract—are also based on P&G's false and misleading representations that Tampax Pure Cotton tampons are "pure" and "100% organic cotton." The district court did not separately address these claims, and the plaintiffs do not either.

21

**I. The plaintiffs have plausibly alleged a reasonable consumer would understand Tampax Pure Cotton tampons to be free from chemicals or contaminants or, at the least, undisclosed chemicals or contaminants.**

Starting with what a reasonable consumer would believe, the plaintiffs have alleged they would understand Tampax Pure Cotton tampons to be "pure," "100% organic," and therefore free from chemicals or contaminants. Those allegations are plausible, and P&G's arguments below about disclaimers and ingredient lists are factual disputes "not appropriate for decision at the pleadings stage." *Whiteside*, 108 F.4th at 778 (citation modified). After all, reasonable consumers are not "expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." *Williams*, 552 F.3d at 939. But, even if a court were to consider information beyond the front label of Tampax Pure Cotton boxes, that information only reinforces the misrepresentation that the tampon itself is made of pure cotton while the plastic applicator and individual packaging contain artificial ingredients. At a minimum, however, a reasonable consumer would understand Tampax Pure Cotton tampons to not contain *undisclosed* chemicals or contaminants, and it is undisputed that P&G discloses nowhere that the Tampax Pure Cotton tampons contain organic fluorine.

## A. The "Pure Cotton" brand name, emphasis on "100% organic cotton," and cotton plant imagery all reasonably convey that the tampons are chemical-free.

Here, the plaintiffs have plausibly alleged that a reasonable consumer would understand Tampax "Pure Cotton" tampons containing "100% organic cotton" to be tampons "free from chemicals [or] contaminants." ER-16 ¶ 38; ER-27 ¶ 91. Featured prominently on the front label of the product, the brand name touts the tampons as "Pure Cotton." ER-10 ¶ 5; ER-16-17 ¶ 39. Right below the brand name, the front label emphasizes that each tampon "contains **100% organic** cotton core." ER-10 ¶ 5; ER-16-17 ¶ 39 (emphasis in original) This messaging is reinforced by the illustrations of the cotton plant, which give the impression that Pure Cotton tampons are made of just organic cotton and are therefore "pure" and chemical-free. ER-10 ¶ 5; ER-16-17 ¶ 39.

This accords with the ordinary meanings of the terms P&G uses to label Tampax Pure Cotton tampons. *See Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1229 (9th Cir. 2019) (looking to dictionary definitions to understand the meaning a reasonable consumer would ascribe to product labels and marketing). "Pure" conveys that something is "unmixed with any other matter," "free from what vitiates, weakens, or pollutes, and "containing nothing that does not properly

23

belong."[4] "100 percent" indicates "completely" or "entirely,"[5] and, in the context of food, "organic" refers to "food produced . . . without employment of chemically formulated fertilizers, growth stimulants, antibiotics, or pesticides."[6] So, in the context of consumer products more generally, "100% organic" conveys a product made entirely without artificial or "chemically formulated" additives.

Consistent with these ordinary meanings, courts regularly conclude that the term "pure" reasonably conveys an absence of "even . . . trace amounts" of "an artificial or synthetic ingredient." *See Tran v. Sioux Honey Ass'n, Coop.*, No. 8:17-CV-110, 2018 WL 10612686, at *5 (C.D. Cal. Aug. 20, 2018) (plaintiff plausibly alleged reasonable consumer would interpret honey labeled "Pure" and "100% Pure" to not have "synthetic substances such as glyphosate"). For example, in *Berke v. Whole Foods Market Inc.*, the plaintiff plausibly alleged that reasonable consumers would be misled into believing that bottled water labeled as "pure" and "pristine" would be contaminant-free even though it "allegedly contain[ed] some of the highest levels of arsenic among bottled water." No. 2:19-CV-07471, 2020 WL 5802370, at

---

[4] *Pure*, Merriam-Webster, https://perma.cc/ZEB4-ZEP6 (last visited Nov. 24, 2025).

[5] *100 percent*, Merriam-Webster, https://perma.cc/H62Z-N6F6 (last visited Nov. 24, 2025).

[6] *Organic*, Merriam-Webster, https://perma.cc/2B54-59Z7 (last visited Nov. 24, 2025).

24

*1, *13 (C.D. Cal. Sept. 18, 2020). That was also the case in *Winans v. Ornua Foods North America, Inc.*: "Assuming the butter contained PFAS," as the plaintiff alleged, "a reasonable consumer could be misled by the 'Pure Irish butter' label." 731 F. Supp. 3d 422, 429 (E.D.N.Y. 2024). As the *Winans* court explained, "'pure' is a common product label" that "indicate[s] the absolute absence of contaminants" such that "a reasonable consumer viewing the product would interpret the terms to mean that the product is free of other substances." *Id.* at 430 (quoting *Axon v. Fla.'s Nat. Growers, Inc.*, 813 F. App'x 701, 705 (2d Cir. 2020)).

A reasonable consumer's understanding of "Pure Cotton" would be buttressed by the representation that the tampons "contain[] 100% organic cotton core." ER-10 ¶ 5; ER-16-17 ¶ 39; ER-27 ¶ 91. Courts have consistently held that the combination of "pure" and "organic" conveys an "absence of contaminants," particularly when those terms purport to describe ingredients. *See, e.g.*, *In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1089 (N.D. Cal. 2024). In *Theos*, for example, the plaintiffs plausibly alleged reasonable consumers would believe that chocolate labeled as "[p]ure" with "quality cacao bean" and "organic chocolate you can feel good about" does not contain contaminants like heavy metals. *Id.* at 1088. Similarly, in *Brown v. Hain Celestial Group, Inc.*, the plaintiff plausibly alleged reasonable consumers would understand "Pure, Natural & Organic" face wash to be "either completely or at least mostly organic." 913 F. Supp. 2d 881, 885 (N.D. Cal. 2012);

25

*see also Jou v. Kimberly-Clark Corp.*, No. 3:13-CV-03075, 2013 WL 6491158, at *6-7 (N.D. Cal. Dec. 10, 2013) (plaintiff plausibly alleged that reasonable consumers would understand diapers marketed as "pure & natural" and containing "soft organic cotton" to be "free of synthetic ingredients").

P&G's use of "100%" only solidifies the connection the company seeks to draw between Tampax Pure Cotton and a product free from chemicals or contaminants because "describing a product as 100%-something" can, obviously, convey that the product is exclusively that thing. *Whiteside*, 108 F.4th at 783-84; *see Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 473-74, 476-77 (7th Cir. 2020) (concluding that reasonable consumer could be misled by product labeled "100% Grated Parmesan Cheese" when product contained non-cheese ingredients). When that "100%-something" representation is combined with another representation that portrays a product as organic, natural, or something of the like, a consumer reasonably understands that product to be chemical-free. In *Balser v. Hain Celestial Group, Inc.*, this Court explained that a reasonable consumer would understand "statements that the products were 'natural' and '100% vegetarian' . . . as a claim that no synthetic chemicals were in the products." 640 F. App'x 694, 696 (9th Cir. 2016). So, too, here: A reasonable consumer would understand statements that the tampons are "Pure Cotton" and contain "100% organic cotton" as a claim that "no synthetic chemicals were in the products." *See id.*

26

### B. P&G's arguments about what reasonable consumers might understand are not properly addressed at the pleading stage.

Below, P&G offered two reasons why reasonable consumers would not take P&G at its word that Tampax Pure Cotton tampons are "pure cotton," "100% organic cotton," and, therefore, free from chemicals or contaminants. But generally, questions about how consumers interpret product labeling is "a question of fact not appropriate for decision at the pleading stage" unless the labeling "itself makes it impossible for the plaintiff to prove that a reasonable consumer is likely to be deceived." *Whiteside*, 108 F.4th at 778 (citation modified). It is thus a "rare situation" when a court may determine, as a matter of law, that reasonable consumers are not likely to be deceived. *Williams*, 55 F.3d at 939. This is not the rare case.

*First*, P&G argued that the brand name "Pure Cotton" "is too vague and generalized to support any interpretation regarding the presence or absence of alleged undisclosed chemicals or contaminants." Mot. to Dismiss Third Am. Compl. at 16. While "general, vague statements" about a product are usually insufficient to mislead consumers, statements that falsely or misleadingly describe a "specific or absolute characteristic of the product" are actionable. *See Castillo v. Prime Hydration LLC*, 748 F. Supp. 3d 757, 771 (N.D. Cal. 2024) (statements that drink that helps consumers "refresh, replenish, or refuel" as "perfect boost for every endeavor" were too vague and unspecific to mislead consumers about drink's health benefits) (citation omitted). Describing an ingredient—here, cotton—as "pure" and

27

"100% organic" is the definition of an actionable "affirmative and specific factual representation." *See, e.g.*, *Rojas v. Gen. Mills, Inc.*, No. 3:12-CV-05099, 2014 WL 1248017, at *5 (N.D. Cal. Mar. 26, 2014) ("alleged misrepresentation '100% NATURAL'" was "not merely general in nature" because it "convey[ed] the affirmative and specific factual representation that the products are made *entirely* of natural ingredients" (emphasis in original)). That specificity was lacking in *Taylor v. Procter & Gamble Co.*, on which P&G relied below, where the brand name "Pure by Gillette" was not actionable because "Pure" did not purport to make any factual representations *and* there were not other "purity representations . . . separate from the product['s] name[]." No. 3:22-CV-01949, 2023 WL 5289451, at *4 (S.D. Ill. Aug. 17, 2023). And while the plaintiff there had not advanced this theory, *Taylor* recognized that the term "pure" *can* reasonably convey a product "containing ingredients that are free from other impurities or contaminants not essential to the product." *Id.* That, of course, is exactly what the plaintiffs here have alleged "Pure Cotton" conveys.

*Second*, P&G argued that because the "Pure Cotton" brand name is followed by an asterisk which refers to a "disclaimer"—"*contains 100% organic cotton core"—a consumer would understand that the tampons "contain non-cotton ingredients beyond the core." *See* Mot. to Dismiss Third Am. Compl. at 16. Even if that were true (and it's not, *infra*), P&G does not and cannot dispute that it conveyed

28

that the tampon's "core" "contains 100% organic cotton." ER-10 ¶ 5; ER-11 ¶ 8; ER-16-17 ¶ 39. And as the plaintiffs have plausibly alleged, that alone is false and misleading because the plaintiffs' independent third-party testing detected organic fluorine in each component of Tampax Pure Cotton tampons, *including* the absorbent core. ER-23 ¶¶ 64-65.

But, in any event, P&G is also wrong that, as a matter of law, a reasonable consumer would not think the "100% organic cotton" claims referenced the tampon as a whole. P&G argued below that the ingredients list on the side of the box only "confirmed" that its cotton claims were limited to the core. Mot. to Dismiss Third Am. Compl. at 16. Questions about back labels and ingredient lists, however, are premature: Because P&G's "front label" representations are "plausibly misleading to reasonable consumers," the Court "does not consider the back label at the pleading stage." *Whiteside*, 108 F.4th at 778. A front label is "plausibly misleading" when, as here, a consumer would not "necessarily require more information before reasonably concluding that the label [wa]s making a particular representation." *Id.* at 781. In that case, reasonable consumers expect a back label to simply *confirm* what has been represented on the front label. *Id.* at 778.

Take *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1167 (2018). In *Brady*, the plaintiff plausibly alleged that a front label was misleading because a consumer would not require more information to reasonably conclude, based on the specific

29

representation inherent to "One A Day" branded vitamins, that the dosage was one vitamin per day. *Id.* at 1178-80. Then, even though the back label clarified that the dosage was two vitamins per day, "[w]hether the back label ultimately defeats the plaintiff's claims [wa]s a question left to the fact-finder." *Whiteside*, 108 F.4th at 778 (describing *Brady*, 26 Cal. App. 5th at 1178-80). That was not the case in *McGinity v. Procter & Gamble Co.*, where a consumer *would* need more information to understand what was conveyed by hair products branded "Pantene Pro-V Nature Fusion." 69 F.4th 1093, 1098-99 (9th Cir. 2023). Then, it was appropriate at the pleading stage to consider the back label, which clarified the ambiguity on the front of the label by listing both natural and synthetic ingredients. *Id.*

Here, a consumer would not need to look beyond the front label of a box of Tampax Pure Cotton tampons to reasonably believe the tampons are free from chemicals or contaminants based on the representations that they are "pure" and "100% organic cotton." ER-16 ¶ 38; ER-27 ¶ 91. A reasonable consumer would understand the two asterisks on the front of the box to be in relation to each other and not an indication to ferret out additional information elsewhere: "Pure Cotton*" appears directly above "*contains 100% organic cotton core." ER-10 ¶ 5; ER-16-17 ¶ 39. And a consumer could reasonably understand the reference to the "core" of the tampon to refer to the entire tampon itself, as distinct from the other components of the product that are illustrated on the front of the box and that are obviously not made

30

of cotton: the plastic applicator used to insert the tampon and the packaging around each applicator with an unused tampon inside. *See* ER-10 ¶ 5; ER-16-17 ¶ 39. This is particularly the case because tampons are, for many women, commonplace items and this Court has confirmed "that consumers of everyday items are not expected to study labels with the same diligence as consumers of specialty products" who may have "deep knowledge of how [such products] are made." *Whiteside*, 108 F.4th at 782. So, with an ordinary shopper in mind, the plaintiffs are not "pursu[ing] a claim based on a statement that can only be misleading when the information surrounding it is ignored." *Bobo v. Optimum Nutrition, Inc.*, No. 3:13-CV-02408, 2015 WL 13102417, at *4 (S.D. Cal. Sept. 11, 2025). Rather, it is the entire front label, including the informational asterisks, that reinforces the deceptive message that these tampons are, on the whole, "pure" and "100% organic cotton."

But even if these representations were ambiguous, the information on the back of the box does not dispel the deception as a matter of law. To the contrary, it *reinforces* the deception by portraying the tampon itself as all cotton. The back label again presents the tampon as "Pure Cotton": the core is "100% organic cotton," the "outerwrap" around that core is "100% organic cotton," and the string is "cotton." ER-10-11 ¶ 6; ER-17-18 ¶ 40. That is in contrast to the "60% plant-based plastic applicator." ER-10-11 ¶ 6; ER-17-18 ¶ 40. So, the fact that the ingredients list, which is on the side of the box and separate from the reinforcing back-label information,

31

includes non-cotton ingredients—polypropylene, polyester, glycerin, paraffin, and titanium dioxide, ER-18 ¶ 41—is perfectly consistent with the tampon itself being all cotton and the applicator and individual packaging being made with the artificial ingredients listed.[7]

Of course, nowhere on the packaging does P&G disclose the presence of organic fluorine. ER-18 ¶ 41. At a minimum, then, even if the ingredient list means that a reasonable consumer would not believe Tampax Pure Cotton tampons to contain *no* artificial chemicals or contaminants, it is plausible that a reasonable consumer would believe the tampons to contain no additional *undisclosed* artificial chemicals or contaminants. That is because P&G both affirmatively represents the tampons as containing only particular types of ingredients—namely, "pure" and "100% organic" cotton and, to the extent relevant at this stage in the litigation, the ingredients listed on the side panel, ER-16-18 ¶¶ 39-41—and holds itself out as a trustworthy company dedicated to transparency and selecting "only the ingredients you need." ER-19 ¶¶ 43-44; *see also* ER-14 ¶ 30; ER-21 ¶ 52; ER-25 ¶ 76. A

---

[7] True, the back label does not specify the composition of the "leakguard braid." ER-10-11 ¶ 6; ER-17-18 ¶ 40. But that silence does not make it "*impossible* for the plaintiff[s] to prove that a reasonable consumer was likely to be deceived" into thinking that the whole of the tampon—from tip to string—is pure cotton and chemical-free. *Whiteside*, 108 F.4th at 785 (emphasis added). Instead, how a reasonable consumer would understand the braid to relate to the rest of the tampon is a question of fact properly left to the fact finder. *See id.*

reasonable consumer would not, therefore, think that a company like P&G had failed to disclose the presence of an artificial chemical or contaminant.

**II.      The plaintiffs have plausibly alleged the detected organic fluorine is a man-made chemical compound whose presence contradicts P&G's representations about the contents of Tampax Pure Cotton tampons.**

The plaintiffs have also plausibly alleged that Tampax Pure Cotton tampons contain organic fluorine—a chemical compound that, despite the "organic" in its name, is almost exclusively man-made and used in industrial applications, like pesticides and forever chemicals. So, because a reasonable consumer would believe Tampax Pure Cotton tampons to be "pure," "100% organic cotton," and therefore free from chemicals or contaminants, and the tampons are not, in fact, those things, the plaintiffs have plausibly alleged an actionable misrepresentation. The district court was wrong to disagree.

The district court, like P&G, did not question that the plaintiffs' independent third-party testing by a certified laboratory detected organic fluorine in Tampax Pure Cotton tampons. It still, however, found the plaintiffs' allegations interpreting the results of that testing to be "implausible" for two reasons. ER-4. First, the court concluded that the detected organic fluorine could not plausibly be considered an artificial "chemical" or "contaminant" that contradicts P&G's "pure" and "100% organic cotton" representations because organic fluorine *sometimes* comes from natural sources. *See* ER-5. But the plaintiffs' allegations were well-supported by

33

both their independent testing and scientific literature about artificial versus natural organic fluorine, and that's all that plausibility requires. By requiring the plaintiffs instead to essentially prove, before discovery, that the organic fluorine could not have come from natural sources, the district court failed to take the plaintiffs' allegations as true, effectively and prematurely resolving one of the parties' central factual disputes in P&G's favor and improperly holding the plaintiffs to an unduly stringent pleading standard. Second, the district court concluded that the plaintiffs failed to plausibly allege that the tampons contain harmful levels of organic fluorine. *See* ER-6. That conclusion was based on a misunderstanding of the plaintiffs' theory of liability as alleged in the third amendment complaint. Under that theory, *any* level of organic fluorine renders P&G's representations deceptive.

> **A. The district court should not have required the plaintiffs to prove, at the pleading stage, that the organic fluorine detected in Tampax Pure Cotton tampons is man-made rather than natural.**

The district court found implausible the plaintiffs' allegations that P&G misrepresented Tampax Pure Cotton tampons as free from chemicals or contaminants or, at the very least, undisclosed chemicals or contaminants, because, it said, they failed to allege whether the detected organic fluorine "may be indicative of natural sources or is largely, if not exclusively, linked to forever chemicals or some unspecified man-made chemical or contaminant." ER-5 (citation modified). To the contrary, the plaintiffs explicitly alleged that the detected organic fluorine

34

was both itself man-made and indicative of other man-made chemicals or contaminants. In support, they cited scientific literature to allege it is highly unlikely for organic fluorine found in a consumer product to be natural because organic fluorine is "almost exclusively man-made and used in industrial applications," ER-22 ¶ 57, like non-stick cookware, firefighting foam, and pharmaceuticals. ER-12 ¶ 10. Relying on that same literature, the plaintiffs alleged that although there are some examples of naturally occurring organic fluorine, those examples are "exceedingly rare," such as a "rare indigenous South African plant." ER-22 ¶ 58. Based on that literature, the plaintiffs alleged those rare natural sources "would never be the source of organic fluorine in a consumer product," even incidentally. *Id.*

To the extent the district court did consider these allegations, but found them implausible, that was error too. "The standard at this stage of the litigation is not that [the] plaintiff's explanation must be true or even probable." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Instead, the claim need only be "plausible," which means the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021). Put another way, the question is whether, taking the factual allegations as true and construing them in the plaintiff's favor, *id.*, there is "a reasonable expectation that discovery will reveal evidence to support the

35

allegations." *Starr*, 652 F.3d at 1217 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (citation modified).

That is why courts routinely find plausible claims that a defendant's product labeling or marketing is deceptive when the allegations rely on testing and scientific literature—even when the defendant takes issue with the plaintiff's interpretation of that evidence. For example, in *Warren v. Whole Foods Market California, Inc.*, the plaintiff relied on testing to allege that coffee creamer labeled as "Naturally Flavored by Vanilla" actually contained an "artificial flavoring substance named ethyl vanillin . . . made through a non-natural process." No. 3:21-CV-04577, 2022 WL 2644103, at *5 (N.D. Cal. July 8, 2022). Notwithstanding the defendant's challenge to this "interpretation[]," the court found the plaintiffs' claims to be "plausible on their face" because their allegations, "taken as true," allowed the court to "reasonably infer" that "artificial flavoring ethyl vanillin exists in the [creamer] at issue here." *Id.* at *5-6. Similarly, in *Zapata Fonseca v. Goya Foods Inc.*, the court found the plaintiff's claims plausible where they alleged DNA testing showed that products labeled "octopus" actually contained squid, noting that the defendant's issues with the testing "should [be] explore[d] in discovery." No. 5:16-CV-02559, 2016 WL 4698942, at *6 (N.D. Cal. Sept. 8, 2016).

As another example, take *Squeo v. Campbell Soup Co.*, where the plaintiff relied on scientific literature to allege that chips were misrepresented as being free

36

from artificial preservatives. No. 5:24-CV-02235, 2024 WL 4557680, at *4 (N.D. Cal. Oct. 22, 2024). Citing "reports from a scientific journal and the United States Department of Agriculture," the plaintiffs alleged that "while citric acid can form naturally in fruit, it is not the naturally occurring citric acid, but the manufactured citric acid that is used extensively as a food and beverage additive" because it "is not commercially feasible to use natural citric acid." *Id.* at *1, 4 (citation modified). Although the defendant disparaged this interpretation as speculative, the court disagreed, finding that the plaintiff's "well-supported allegations," which the court took as true, "render it highly likely that the citric acid included in the chips was artificially produced." *Id.* at *4. "At the very least," though, those allegations permitted the court to "reasonably infer that Defendants include[d] manufactured, as opposed to naturally produced, citric acid." *Id.*

Finally, consider *Gasser v. Kiss My Face*, No. 3:17-CV-01675, 2018 WL 4538729 (N.D. Cal. Sept. 21, 2018). In that case, the defendant argued something similar to what P&G has argued here: The plaintiffs alleged that the body wash at issue contained a synthetic ingredient, and the defendants countered that the plaintiffs' complaint cited a source saying the ingredient could be a natural derivative of coconut. *Id.* *4. That possibility did not mean the plaintiffs' allegations were implausible. As the court said, "[w]hether the evidence will support [the plaintiffs'] allegation is an issue for summary judgment." *Id.* at *4. At the pleading

37

stage, however, the court "must accept as true Plaintiffs' allegation" that the ingredient was synthetic. *Id.*

The district court should have done so here, too, accepting the plaintiffs' allegations as true and then asking whether it could reasonably infer that P&G misrepresented Tampax Pure Cotton tampons as being something they are not. The plaintiffs relied on scientific literature to allege that organic fluorine in consumer products like the tampons here is almost certainly artificial. *See, e.g.*, ER-22 ¶ 57 (alleging that organic fluorine is "almost exclusively man-made"). Those allegations are "plausible on their face," *Warren*, 2022 WL 2644103, at *5, even though, similar to *Gasser*, the literature acknowledges that organic fluorine can in rare circumstances be "naturally occurring" too. *See* ER-22 ¶ 58 (alleging that naturally occurring organic fluorine is "exceedingly rare" and "not found or used in the industrial world"). Had the district court properly accepted the plaintiffs' allegations as true, it would have recognized that those allegations "render it highly likely" that the organic fluorine detected in Tampax Pure Cotton tampons is "artificially produced." *Squeo*, 2024 WL 4557680, at *4. But, "at the very least," they enable the court to "reasonably infer" that Tampax Pure Cotton tampons contain organic fluorine from "manufactured, as opposed to naturally produced" sources. *Id.*

The district court did not apply this well-established framework for evaluating the plaintiffs' allegations. It did not take as true the plaintiffs' well-pleaded

38

allegations about the likelihood that the organic fluorine in Tampax Pure Cotton tampons is artificial rather than natural. Nor did the court ask whether it could reasonably infer from those allegations that P&G is liable for the deceptive conduct alleged. Instead, it turned the plausibility standard on its head by effectively requiring the plaintiffs to *completely refute* the possibility that the organic fluorine in Tampax Pure Cotton tampons comes from natural sources. *See* ER-5 (faulting plaintiffs for not addressing possibility that organic fluorine "may be indicative of natural sources"). That's not the standard. At the pleadings stage, a plaintiff's "explanation" need not be "true or even probable" to be plausible. *Starr*, 652 F.3d at 1216-17. Indeed, even at the summary judgment phase, a plaintiff is not required to "not only produce affirmative evidence, but also fatally undermine the defendant's evidence, in order to proceed to trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 993 (9th Cir. 2018).

It might be different if the literature the plaintiffs cited directly undermined their allegations and rendered them patently implausible. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (Courts "need not accept as true allegations contradicting documents that are referenced in the complaint."); *cf. Squeo*, 2024 WL 4557680, at *4 (denying motion to dismiss where plaintiffs' assertions were *not* "patently implausible"). Even P&G hasn't argued that. Instead, it has argued there is a potential alternative explanation for why organic fluorine

39

might be in its "pure" and "100% organic cotton" tampons: Organic fluorine has been detected in rainwater and P&G uses water to clean the cotton used in its tampons. Mot. to Dismiss Third Am. Compl. at 14; *see also id.* at 6, 18. That seems farfetched. At the very least, the district court should not have effectively accepted this hypothetical over the plaintiffs' well-supported allegations, which, of course, are to be taken as true at the pleadings stage. *See Gasser*, 2018 WL 4538729, at *5 ("Whether the evidence will support [the plaintiffs'] allegation is an issue for summary judgment."). Moreover, even if P&G's explanation were possible, when "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss." *See Starr*, 652 F.3d at 1216; *see also, e.g.*, *Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 963 (N.D. Cal. 2017) (denying motion to dismiss CLRA, FAL, and UCL claims because "relevant studies supporting plaintiffs' theory (at least in part) have been alleged, and determining the full extent of that support is not appropriate on a motion to dismiss"). Because the plaintiffs' explanation for the organic fluorine detected in Tampax Pure Cotton tampons is plausible—indeed, it's extremely likely—their complaint should have survived the motion to dismiss.

40

**B.** **The district court should not have required the plaintiffs to allege that the level of organic fluorine detected in Tampax Pure Cotton tampons is harmful.**

The district court also found the plaintiffs' allegations about organic fluorine "insufficient" because, citing its previous order, it said the plaintiffs alleged only that the third-party testing detected "above trace amounts" of the compound. ER-6. Looking to the order dismissing the second amended complaint, the court faulted the plaintiffs for not "plausibly alleg[ing] PFAS are present in the Products *at a harmful level*." ER-64 (emphasis added). The plaintiffs disagree that their previous allegations fell short in this regard. But that does not matter because, in response to the district court's concerns, the plaintiffs amended their complaint and clarified their theory of deception to focus exclusively on claims that P&G misrepresented Tampax Pure Cotton tampons as being free from chemicals or contaminants, or, at the very least, undisclosed chemicals or contaminants, and not also, as they previously alleged, as being healthy. *See* Opp. to Mot. to Dismiss Third Am. Compl. at 2-3 (clarifying that the operative third amended complaint "omits prior allegations" about harm to reflect their narrowed misrepresentation theory). So, whether the organic fluorine in the tampons is "dangerous or potentially harmful" simply has no bearing the element of deception and whether P&G's representations are likely to mislead a reasonable consumer. *Id.* at 5; *cf. Berke*, 2020 WL 5802370, at *8 (rejecting argument that plaintiff lacked standing to allege consumer product

41

was "unsafe" because "that is not Plaintiff's theory," which instead "focuses on" the "allegedly misleading advertising and labeling" of that product).

To be sure, consumer *perception* of the health risks associated with chemicals or contaminants will be relevant to the plaintiffs' claims because it goes to the distinct element of "materiality" or why consumers might "attach importance" to the misrepresentation "in determining [their] choice of action in the transaction in question." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 332-33 (2011) (citation modified).[8] And here, the plaintiffs have alleged that consumers may "attach importance" to tampons—which are placed and then remain in a woman's vagina for hours on end—being "pure," "organic," and chemical-free *because* they are worried about the potential risk of exposure. *See* ER-9 ¶ 3 (alleging that consumers are concerned about "unnecessary" chemicals or contaminants because they *might* be "potentially harmful"); ER-15 ¶ 33 ("Currently, there is significant concern about the chemicals used and the contaminants found in feminine hygiene products," which "has contributed to many women's efforts to seek out alternative menstrual hygiene products[.]"); ER-31-32 ¶¶ 119-20 (detailing potential health effects of man-made products that include artificial organic fluorine). But the deception— P&G misrepresenting Tampax Pure Cotton tampons as being "pure" and "100%

---

[8] The district court did not address materiality and that question is not before this Court. But "[i]n any event . . . materiality is generally a question of fact" not properly resolved on a motion to dismiss. *See id.* at 333.

organic cotton"—is the same whether consumers' fears about chemicals or contaminants are founded or not.

## CONCLUSION

For the foregoing reasons, the plaintiffs respectfully ask this Court to reverse the order of the district court dismissing the third amended complaint with prejudice.

Date: November 25, 2025

Rachel Soffin (FL Bar 18054)
Mailing Address:
PEARSON WARSHAW, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
(818) 788-8300
*rsoffin@pwfirm.com*

Melissa S. Weiner
PEARSON WARSHAW, LLP
328 Barry Ave. S., Suite 200
Wayzata, MN 55391
(612) 389-0600
*mweiner@pwfirm.com*

Michael H. Pearson
PEARSON WARSHAW, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
(818) 788-8300
*mpearson@pwfirm.com*

/s/ Hannah M. Kieschnick
Hannah M. Kieschnick
Leila Nasrolahi
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
*hkieschnick@publicjustice.net*
*lnasrolahi@publicjustice.net*

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
*lnicholls@publicjustice.net*

Harper Todd Segui
LEE SEGUI, PLLC
825 Lowcountry Blvd., Suite 101
Mount Pleasant, SC 29465
(919) 600-5000
*hsegui@leesegui.com*

*Counsel for Plaintiffs-Appellants*

43

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** No. 25-4978

I am the attorney or self-represented party.

**This brief contains** 10,035 **words,** including 79 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Hannah M. Kieschnick **Date** 11/25/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form15instructions.pdf](http://www.ca9.uscourts.gov/forms/form15instructions.pdf)

**9th Cir. Case Number(s)** | No. 25-4978

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Plaintiffs-Appellants' Opening Brief

**Signature** | /s/ Hannah M. Kieschnick | **Date** | 11/25/2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* [forms@ca9.uscourts.gov](mailto:forms@ca9.uscourts.gov)

**Form 15** | *Rev. 12/01/2018*